Next case is TSG Incorporated versus EPA. Good morning. Good morning, Your Honor. My name is Bart Cassidy, attorney for Petitioner TSG Incorporated. I respectfully request to reserve three minutes of my time for rebuttal. Good. Thank you. This case arises from a determination made by EPA under a federal regulation promulgated under the Clean Air Act. This is a preliminary question. Why don't you participate in the subpart, or quadruple, of rulemaking? Your Honor, principally because based upon the rulemaking as developed, and I'll speak to some of the rulemaking information in a moment, it was the position of the company that there was no concern about the applicability of this rule. They felt that the rulemaking record during the development stage may have… Certainly leads to a very significant question as to whether this is a finish or a cut. Well, Your Honor, we believe the rulemaking record during the development stage clearly distinguished between aqueous operations on the one hand, which were looked at for purposes of finishing requirements, and organic solid-based applications on the other hand, which were evaluated exclusively on the coding side. And with respect to the relevant requirements that came out of that distinction, the company did not foresee a particular concern or problem relative to the obligations under the Fabric Act as it would apply to their operations. And I think in that respect, Your Honor, it is important to note, and it has perhaps been an issue, but the company is not contending that the regulation does not apply at all to their operations. Throughout this proceeding, it has been their position that the finishing provisions of the Fabric Act do not apply. And I'd like to try to address that in three ways. The first, we believe that to the extent that the regulation does provide any indication as to whether the finishing or coding requirements apply, the regulatory language itself supports the argument that it is the coding provisions that apply. Second, we would be very ready to concede that the language is far from crystal clear relative to the definitional sections of the rule. And for that reason, the rulemaking record is particularly important in this case. And we believe that EPA erred in refusing to consider that during its own analysis and is wrong as a matter of law in contending that the court may not consider it in the context of this proceeding. And third, we believe what really has happened in this case is that EPA has effectively looked at this as a presumptive obligation, in essence making the determination that TSG has not provided in their assessment sufficient information to allow EPA to conclude that we're not finishing and therefore, by presumption of default, we are. And we don't believe that that's the appropriate regulatory structure in this case. It would seem to be a relatively simple matter to determine whether in fact there was impregnation of the fibers or whether there's a coding. And I'm still not clear why these two ships are crossing in the middle of the night. Thank you for that. Maybe it goes back to the question that Judge Ambrose asked, why didn't you object at the time? Is it absolutely clear that solvent-based regulations were not to be considered at this time in the beginning? Well, I think for a couple of reasons, Your Honor. It seemed to us certainly during the rulemaking development phase that it was, and I'll point to a few places for that reason. First, it's repeated throughout the rulemaking record that when EPA talks about finishing operations, they characterize it as an aqueous process. And indeed, and most importantly for purposes of the regulatory language itself, as Your Honor points out, when the definitions are examined for coding and finishing, there's a great deal of overlap. EPA concedes that. The only real distinction in the definitions that are particularly relevant, as Your Honor is happy upon by virtue of the question, is the issue as to whether or not the process involves impregnating the fibers and whether or not a solid coding is formed in that process. The specific provisions, if you look at the issue, and I'll try to address your question directly, Your Honor, as to whether or not it's clear on the record, and in our opinion, that what EPA has ultimately concluded was there wasn't information on the record to enable them to determine that a solid coding was informed and that there wasn't impregnation. But there is nothing on the record that is before the agency that supports the impregnation concept or the absence of a solid coding. What was in the record that supports your view that this was a, quote, continuous solid film? Well, Your Honor, I think there was principally the one issue that the EPA has looked at on the record is a relevant document that they had obtained from the Pennsylvania Department of Environmental Protection. That document constituted a description of the process operations that TSG engages in. And I can specifically draw Your Honor's attention to that within the Joint Appendix. It appears at JA 086 in there following. The discussion of the operation there is specifically describing the activities at TSG, talking about the fact that this material is pulled through a spray box and sprayed with a trichloroethylene mixture, then proceeding on to an oven, and there's a spray application on a single side of the material as it's being passed through. When we look at EPA's rulemaking record with respect to their discussion of coding operations in their technical support document for the rule, which is part of the Joint Appendix that EPA has disputed, but to reference it, it's at JA 264. The description that EPA gives of coding operations, to read directly, it talks about coding or printing process generally comprises the following unit operations, mixing the coding materials, conditioning the substrate, applying the coding to the substrate, evaporating the solid in the drying oven. The coding further down in that same paragraph, the coding industry treats coding as a surface-applied coding with a distinct layer of coding applied to the subsurface. The description that is before the agency relative to this operation, what the Pennsylvania Department of Environmental Protection had assembled, talks about the mixing of this material, the application by spray nozzles onto one side of that fabric as it's pulled through the spray box, then proceeds to the oven for evaporation. Virtually an exact description that comes out of EPA's own technical support document for what coding operations comprise. Page 86 of the appendix states that the fabric becomes quote, laden, L-A-D-E-N, close quote, with solvent. That, to me, sounds more like impregnating than it does just something on the surface. Do you mean laden differently? Well, I think for purposes of the description, it is in fact different, Your Honor. The application is a spray coding across, and as the depiction of the equipment that follows seeks to make clear, the laden concept is intended to say that it is continuous across. It is not just portions of the fabric that receive the application of the coding. It is a continuous process, and the entire fabric needs to receive the coding in order to impart the desired qualities to it. But doesn't laden sound a bit more like impregnating as opposed to just on the surface? Well, Your Honor, I don't think that that word lends itself necessarily to that interpretation. I think in this particular case, that isn't the intent. That laden is, for purposes of this circumstance, intended to address the breadth of the fabric that is covered by the material. How do you deal with your letter of June 23, 2005, which your client is continually referring to what they do as finishing? I think two responses to that, Your Honor. First, for purposes of the use of these terms in the industry, what TSG engages in is for purposes of these activities, finishing activities. That's how they describe it, because for the customers that are out there to which they're serving, they are looking for a finished product when they are sending materials to be able to be addressed by TSG. Second, when we look at and we specifically mention even in that letter the relative definitions of both coding and finishing, the relative overlap of those two definitions of such that absent the issue of the discussion of impregnation, it is a finishing activity. There's nothing else in distinguishing these two that says this would not by all common terms in the industry look at this as a finishing activity as we use that term. But once EPA uses those terms as having very important distinctions from a regulatory basis, the only thing we can get back to is first to say there's a lot of overlap here, but we can see that coding doesn't include finishing when something happens. We don't believe there's evidence on the record that says that, in fact, is happening. And when we look at the only other distinction in the regulation itself that is meaningful for purposes of finishing and coding, it has to do with the emission control standards that are applied to those respective operations. And there is a significant difference in those emission control standards. Namely, for purposes of finishing requirements, EPA has imposed, and this appears in the same place in the same regulation, it's Table 1 and can be found in the Joint Appendix of JA 072. For purposes of coding operations, EPA allows a 97 percent overall control efficiency for organic HAPs and an alternative standard that's framed in terms of the amount of kilograms present, which is 0.12 kilograms of organic hazardous air pollutants per kilogram of solid applied. By contrast... You had it at 99.7. 99.97, Your Honor, effectively. 400 times more stringent. A standard that there's nowhere else in the regulation that would justify such a disparate treatment and requirements for these two areas of application, except relative to the ability to control them. Why not petition for an alternative MACT standard if you fall somewhere in between the cracks here? Well, I think, Your Honor, when we initiated this process, as reflected in the record, we were concerned that we were falling outside the scope even of coding and we were concerned about, not outside the regulatory definition, but rather the ability to meet even that control standard because as the initial submittal identified, the control efficiency we were then able to achieve was more in the range of 95 percent, not 97. Through a lot of additional work by the company, they were able to achieve a 97 percent standard. So the concept of an alternative MACT, which we initially thought would be required, even under the coding standard, we no longer believe would be necessary and we believe we can satisfy that coding standard. Even more, why not file for an alternate MACT standard? The intent, Your Honor, is that first, we don't believe we need one because we believe we fall squarely within the coding standard and can meet that requirement. Second, for purposes... But if you prevailed, you wouldn't need to be here today, if you had an exception. Your Honor, the timeframes that apply and circumstances of seeking, it's a rulemaking process. And to be able to go through the process, to be able to achieve an EPA determination, to establish an alternative MACT for our operations, is highly time-consuming and, relative to at least past history, not typically successful. But they do invite that in the applicability determination, don't they? They do, Your Honor, but from our standpoint, it's not an adequate solution. How long does it take? Rulemaking, Your Honor, takes, as Your Honors are certainly aware, anywhere from a few years to many years. But to get an exception to this particular rule, how long does that take? Well, Your Honor, there's not a specific provision to get an exception from the rule unless you're, as we are here, going through an applicability determination to say the rule as drafted does not apply. So you're saying it applies only to the rule, not to your client? I'm sorry, that was... You're saying that you would have to get an exception actually placed into the rule as opposed to a ruling that, for whatever reason, you get an exception from this rule? Your Honor, I think the only way to get, to my knowledge, a determination from EPA that we're not subject to the rule without getting a change formally to the rulemaking is through the applicability determination process in which EPA can render the determination that, under the rule as promulgated, these standards do not apply to you. That is the vehicle we chose to pursue. Anything short of that, if the rulemaking on its face applies, would require a regulatory change for purposes of any perpetual protection from that requirement. And you're saying it's impossible for you to meet the 99% plus... I'm saying it's impossible, Your Honor, for anyone using an organic solvent HAP to achieve 99.97% control efficiency. We believe the record clearly establishes that. EPA establishes 97% when they're looking at an organic HAP standard. When they talk about the 99.97% standard, they specifically do so in the context of acknowledging that it's an aqueous operation, that the few controls out there that are used in the finishing context are used for purposes of visible emission control and are ineffective at controlling organic hazardous air pollutants. That level of requirement is not imposed anywhere under any federal or state regulation of which I'm aware and can't be achieved based on all of our investigation and based upon EPA's own rulemaking information in reality. Any further questions? We'll have you back on rebuttal. Thank you very much. Mr. Gunter. Good morning. Good morning, Your Honors. May it please the Court. My name is David Gunter. I'm here on behalf of the United States to defend EPA's applicability determination. When you did this rulemaking for finishing in subpart 1000, did you consider that some fabric treatment facilities use chemical solvents rather than water? Your Honor, I don't think the record reveals whether that's the case or not. In general, the references in the record to aqueous and solvent-based processes tend to be couched in terms of typically finishing processes are aqueous-based processes, or we examined solvent-based processes that were coding processes. So I don't know, in fact, whether EPA intended specifically to exempt some processes from finishing operations or coding operations. But what I can tell you is that the language of the regulation itself, the plain language, does not create any such exemption. So with that question that exists as to whether they considered this, if one were to go for an exception, say that because we have a solvent-based process rather than an aqueous-based process, how long would it take them to get a determination as to whether they can get an exception to the finishing process rules regulation? Obviously, I can't make any commitment on behalf of the agency. But for an exception to, for example, in a new source performance standard case, that is a different process, but also under the Clean Air Act Section 111 instead of 112, I've seen an exception like that be made in as few as several months. So it's not years, it's several months. I think that's correct. Again, understanding that I'm not the one who's actually making these determinations, but counsel is correct. For a full-scale rulemaking like the original fabric NESHAP, it may take several years. But when EPA is examining an issue that it's already examined, the record is essentially already compiled, except for whatever else TSG might choose to put into the record in that instance, and the people with the necessary expertise are already at EPA, I think that it could take substantially less than a year's time frame. TSG summarizes or categorizes your applicability determination as stating that you did not have sufficient information before you to make the determination. Is that accurate? At the time that TSG originally requested an applicability determination, that's accurate. EPA didn't have what it considered sufficient information to evaluate TSG's request. However, after that occurred, EPA went to the Pennsylvania Department of Environmental Protection to get the information that TSG had submitted in support of some of its state permitting requirements, and TSG also after that submitted supplemental information to EPA. Does the absence of that material or that information in front of EPA indicate that likewise you didn't have that information in front of you when you originally adopted the regulation? Yes. As far as I am aware, TSG didn't submit any comments on the original fabric NESHAP. So it could easily be argued that you didn't intend to apply this reg to their type of process. Well, it would be possible to argue that, and that would simply be an argument that EPA didn't specifically intend for this regulation to apply to TSG. But it's impossible to determine whether EPA specifically intended that. Instead, what we have to look at is the language of the regulation itself. And in fact, in the Bethlehem Steel case, this Court specifically said, we don't look at what EPA might be expected to have intended or what EPA may have intended, but rather what the language of the regulation says. And I'd like to suggest to the Court that the language of the regulation is much clearer than counsel has suggested. The definition of finishing here is the chemical treatment of a textile that improves the appearance and or usefulness of the textile substrate. And I don't think that TSG can dispute that that is in fact what its process does. And as Judge Ambrose pointed out, TSG's counsel stated that it was conducting finishing operations. In fact, the quote is, TSG's application of stain-repellent chemicals constitutes a finishing operation covered by the regulations. So I don't think that the Court should credit counsel's suggestion that in this letter TSG was using finishing operations in sort of a colloquial sense that might be used in the industry. Rather, TSG admitted in this letter that the regulations would apply to it and called its operations finishing operations several times. It called itself a finisher twice. So there's no reason for EPA to consider whether the industry might use the term finishing differently. It has the admission in this letter, and that is enough for it to have found that the operations were finishing operations. So the evidence is in the record that these operations are finishing operations. This is not a presumption or a default determination, as TSG would like to suggest. Do the definitions of finishing and coating to some extent have an overlap? They do to some extent have an overlap, but I think that Judge Sirica has identified the point of differentiation, which is clear from the regulation. Both the definitions of coating and finishing may apply to TSG insofar as the definition of coating is the application of a semi-liquid coating material to one or both sides of the textile substrate. That is what TSG does.  once the coating material is dried, it bonds with the textile to form a continuous solid film, and as you can see from the applicability determination, that continuous solid film is the key factor that EPA considered to be relevant in deciding which of these two standards might apply to TSG. So it makes no difference whether the chemical is aqueous-based or solvent-based. Is that correct? In the language of the regulation, that's correct. It makes no difference. Does it make sense? I'm sorry? Does it make sense? I mean, is there a difference between the two? Should there be a distinction between the two bases? Your Honor, that's a technical judgment for EPA to make in the first instance, and as the panel has suggested, if TSG presented that issue, first, if TSG had presented in the original rulemaking the issue that the proposed language of the regulation, which was not adopted, did not contain that distinction, then maybe it would have been appropriate at that time for EPA to determine whether it's a distinction that should have been written into the text of the regulation. Likewise, if TSG were to petition the agency now to reconsider its regulatory text to specifically embody that distinction, maybe it would be appropriate for EPA to do so. But what's not appropriate is for TSG or for this Court to take away the agency's role as the first interpreter of its regulation when the agency's interpretation is not contrary to the plain language of the regulation. I think that's covered all my points, so unless the Court has further questions. Thank you very much, Mr. Goetting. Thank you. Mr. Cassidy? Thank you, Your Honor. Very briefly, first, the Co-Counsel indicates that finishing is typically aqueous in the language of the rulemaking development, and we would directly dispute that to point specifically to a portion of the Joint Appendix, not in dispute with JAO 22. Does that help you or hurt you? I think it helps us, Your Honor, because the language in the rulemaking development makes very clear finishing is aqueous, not typically aqueous. But if what they're focusing on is continuous solid film, does it make any difference whether the base is aqueous or solid base? Your Honor, we believe it does in this case because counsel seeks to emphasize that the key determinant for the agency is whether or not a continuous solid film is formed. There's nothing on the record before the agency that says a continuous solid film is not formed. This is exactly why we are asserting that, in essence, this becomes a default determination. EPA is alleging, you have not shown us that a continuous solid film is formed. Therefore, that being the only clear distinction between the definitions we can cite to, we are going to find you subject to this requirement. EPA certainly could have come back and said to us, we don't have enough information here. You have not shown us the prerequisite we need to conclude that you are not a finisher. That's not what they did. In essence, they said, we don't see it here. You're not coming forward with this, and therefore our conclusion is that you are a finisher in this instance. When counsel points to our activities and says it clearly falls within the definition of finishing, it equally clearly falls within the definition of coating. The language for coating, as directly out of the regulation, is the application of a semi-liquid coating material to one or both sides of the textile web substrate. And it goes on to talk about the fact that the purpose of it is to form a continuous solid film for decorative, protective, or functional purposes. That's exactly what we're doing. The other point in the last sentence, we both spent a lot of time emphasizing. He said that to some extent there is some overlap. But they're contending you're a finisher. You've conceded that you're a finisher. And the only difference that I can detect, you're saying, is that their rule that applied to finishing didn't really take into account whether the finishing is solvent-based. No, Your Honor, I wouldn't agree with that characterization. First, we never have conceded that under the regulatory definition we're a finisher. The language cited by counsel said on its face this appears to be finishing. But there's certainly stuff in the record that would give someone the impression that you concede you were a finisher. And you said even on your opening that you do have what you do is in large measure finishing. It's just that you don't think that this particular segment of applying this is a finish but rather a coating. I think what we're saying, Your Honor, is that for purposes of the regulatory distinction, what the reg looks at as to what is finishing and what is coating, we do not do finishing. It's not a matter of saying that we don't believe we are able to satisfy this particular requirement you've imposed under finishing. I'd like to mention the second sentence of that definition. But there certainly is evidence in the record that could give a party the other view, is there not? I understand why counsel is saying that, Your Honor. But part of that is because the definition of coating says coating does not include finishing where the fiber is impregnated, which, of course, means coating does include finishing in all other circumstances. So to suggest that the virtue of the fact that as our term is used we engage in finishing and for purposes of this rule in other circumstances that aspect of the coating definition applies, we wouldn't necessarily dispute that. But by definition, coating can include finishing as long as the impregnation doesn't occur and as long as a continuous solid film is not formed. Now, base position, Your Honors, is that there's nothing on the record to support either of those conclusions and the only thing in the rule that gives us guidance is the differences in emission standards, which is critical to the aqueous versus solvent-based determination. There's nothing else, Your Honors? Anything? Any other questions? Good. Thank you very much, Mr. Cassidy. The case was very well argued by both sides. Take the matter under advisement. The court will take a short recess.